Morning, Bruce Smith on behalf of the appellate. This case deals with the interaction between the Ninth Circuit standards on injunctions under the Endangered Species Act, coupled with the Ninth Circuit cases on the award of attorney fees under the Endangered Species Act, because this case includes both aspects of that Endangered Species Act precedent. What the case shows is that defendants like my client, the Jones, can't win these cases, they have no viable option of prevailing, if the district court misapplies the Ninth Circuit injunctive standard. They can't win, because if the court misapplies the standard and injunction issues, the plaintiffs have then partially prevailed. The defendant, even if they're never found liable for take of an endangered species, lose because unless the case was frivolous, they can't be awarded their attorney fees. So if you get an injunction issue, the plaintiffs have partially prevailed, and then they get an attorney fee award under the Ninth Circuit precedent. Can I ask you a question? If I understand your position correctly, it is that the district court got all or some of the $35,000 part of the attorney's fees wrong, because he relied on the permanent injunction that this court had to have undone. And your position is that with respect to the $12,000 portion, that was all silly stuff that shouldn't have been compensated at that rate. Have I got your position essentially right on the amount of the fees? We think the $35,000 initial award was improper, because the Ninth Circuit reversed the injunction upon which it was placed. Yes, I understand. Here's what I'm saying. Is your position that all of that $35,000 was wrong, or is your position that part of it has to be wrong? It is more complicated than that, if I can explain. One of the points I will make is that the award of the fees to the plaintiffs had two different aspects to it. Once the plaintiffs received and had a stipulation of settlement with the Forest Service, we believe the case should have been over at that point. So there is a question about some fees up to the point at which they settled with the Forest Service. We believe that that is the point at which the case should have been over. Now, at the time they filed the complaint, what the record shows is that they filed it based on the affidavit of a biologist who never went to the site, who gathered no independent data, and who, quite frankly, in the affidavits did not meet the standard for take under the Habitat Modification CFR. So we think the case was not properly filed in the first place, which deals with one part of the initial $35,000 award, or with the total amount, rather. But certainly, once they settled with the Forest Service, any attorney fees based on proceedings after that we think were also improper. With regard to the $12,000, we think that was improper too, because it was all based on the fact that an improper injunction had been issued by the district court. No, well, I don't understand that. The $12,000 has to do with the subsequent stuff. Correct. Okay. So $35,000 worth of the fees occurred up to the point in time that the Ninth Circuit reversed, if I understand it right. Correct. And so at the end of the case, the district court did not revisit any part of that amount, rather just said, look, I awarded $35,000 before. I'm sticking with that. Now I'm adding onto it $12,000 for work that was done post reversal, pre-stipulated movements. Correct. Right? Correct. We don't think the $35,000 or the $12,000 was properly awarded. Okay. Then here, I guess, here's the question. I mean, there's a two-part test and the district court found that the lawsuit, what the lawsuit sought to accomplish was accomplished through the lawsuit. And the district court found that the benefit achieved was required by law and wasn't just gratuitous. Could you say that last part again? Well, it's a two-part test. I mean, I'm not making up anything. That's just what the test is. All right. So the district court found both prongs of the test were met. And it's pretty hard to say that those findings are clearly erroneous, and I'm not sure whether you're saying that they are or not, or whether you're saying, well, even if those findings stand, it's just the calculation of the fee award has to be wrong because the injunction was reversed. So, I mean, what's your theory? Okay. With regard to the two prongs, let me deal with those. If you look at what the district court did, the court seemed to say that on the first prong, did the lawsuit achieve the goals? That was based throughout the entire case and the entire award of attorney fees, the 35 plus the 12, on the fact that they got an injunction, the plaintiffs got an injunction. We don't think the injunction was proper. It was a wrongfully issued injunction. Well, sure. But that was sort of like three quarters of the way through the litigation, as it were. So you've got to look at the whole animal and what they sought was to have this diversion blocked by a fish screen or a head gate, and that's what they got. So how is his finding clearly erroneous in that respect, even though along the way there were wrinkles and curves? Let me address that. That goes to the second prong on whether what they achieved in this, I think you're asking about the head gate and screen, whether it was a gratuitous act on behalf of the defendant. No. No? No, I'm not. As I understand it, the catalyst theory has a two-part test. And the first part of it is whether the lawsuit, what the lawsuit sought to accomplish was accomplished by means of the suit. And the judge says, yeah, sure. Because what they wanted to get was a deal whereby the Otter Creek would not be diverted without a fish screen or a head gate. And they got that. So that's what they started out wanting. And that's what they ended up with. Therefore, the district judge says part one is satisfied. Now, is it your position that that's clearly erroneous entirely? That is entirely incorrect because number one, you have to look at the district court's assessment of the law. That goes to the injunction on the Ninth Circuit standards. When it comes to that head gate and screen, Mr. Jones applied in 1990 for his Colorado ditch bill easement. The Forest Service sat on that application for 10 years. Yes. And but for the suit, the Forest may not have acted even until now. Didn't the judge say if they hadn't filed suit, nothing would have happened? Certainly, Judge, nothing would have happened with regard to processing of that application. Which is separate apart from the injunction. Yes, correct. All right. With regard to the head gate and screen issue, Mr. and Mrs. Jones applied for the easement. And under that law, the Forest Service has no discretion, but to However, they can impose terms and conditions on it. So if Mr. and Mrs. Jones had gone out and said, we want to install a head gate and screen, they could not have done that. That dependent upon what the Forest Service would or would not allow them to do. And in this case, in the very first affidavits filed by Mr. Jones, he pointed out that he was going to comply with what the Forest Service eventually came up with. So the lawsuit against the Forest Service was successful. And there's no issue about that. They filed suit for failing to consult under section seven. The Forest Service settled, agreed to process the application and to engage in consultation. But until that was over, Mr. and Mrs. Jones had no legal right to go out and install a head gate and screen. And it was only once that process had ended five years later or four years later, that they had authorization to go install the screen. This whole case was about the plainest disagreements with the Forest Service over whether they should or should not consult. And they were successful in that. They were paid for that. At that point, actually the process had started when Mr. Jones filed his application. He could not force the Forest Service to process it. He could not force the Forest Service to tell him install a head gate and screen or don't install a head gate and screen or what design or specifications for the head gate and screen would be. So he could have built one. He could have had it sitting there. He had it ready. He could not go install it because he didn't have the authority to do that. That was a Forest Service issue. And the Forest Service had to consult with Fish and Wildlife Service because we were dealing with bull trout before any of that could take place. But the Forest Service didn't act until the suit was filed. And then within four months they acted. And IWP sought to enjoin the Joneses from diverting water until the Forest Service could finish its consultation. And they succeeded in that before the Forest Service issued its biological assessment and they sought to place conditions on a diversion easement pursuant to that assessment and it obtained all of those goals. And Your Honor, I don't disagree with the fact that they were able to get the Forest Service to consult. The Forest Service ultimately came up with a requirement for the head gate and were going to comply with whatever the Forest Service came up with, but they couldn't do anything until that process had ended. All of this was related to the claims against the Forest Service. They turned around and came after Mr. and Mrs. Jones based on the theory that there was a Section 9 take that was demonstrated through modification of habitat. And nowhere in this entire case did the plaintiffs show that there was a taking through habitat modification. Mr. Smith, my understanding of this situation, it's perhaps wrong that this is a suit that emanates from the Endangered Species Act and to make the a showing of a taking or a threatened taking. There was little or no evidence of a taking, but there was purportedly evidence of a threatened taking. And so nothing would have been required of your clients until there was a taking or a threatened taking. And I thought that when it got to the Ninth Circuit, the Ninth Circuit said that there's insufficient evidence to show a threatened taking, which takes us back to day one and the District Court had found the threatened taking and granted an injunction based upon that. And the Ninth Circuit said, no, there's not enough evidence in the record to do that, and so they remanded it. So is there the bifurcation of the fees along the way would have to start at the beginning or what am I not understanding about what happened here? Well, procedurally, you're correct, Judge, because once the Ninth Circuit remanded back to the District Court, we're starting off again with a single claim against my clients, a section nine take claim based on habitat modification, the 50 CFR 17.3 standard. Five minutes. So that puts us back at the starting gate. What we're trying to show is that if you are going to sue a private defendant like this, it is very, very important that you separate the obligations of the federal agencies under section seven, which is the jeopardy standard, the adverse modification of habitat, from a claim against a private defendant under the section nine take claims. And if the District Court applies the injunction standard from the Ninth Circuit, which is the imminent likelihood of or reasonable certainty of imminent harm, it is absolutely critical that the harm that's set forth in the injunction standard reflect the claim made against the defendant. There was no allegation that my clients adversely modified habitat, critical habitat. The only allegation was that they had violated section nine. And let me draw that into context if I can. One of the allegations was that you have taken an endangered species because if a fish gets into the irrigation canal, the temperatures are lethal and fish will die. And there was absolutely no effort by the plaintiffs to go out and actually measure the temperature in the water. They had no clue as to whether that temperature was lethal or not. That goes to, is there harm? Because if the fish gets into the ditch and the temperatures are not lethal, there is no take, and that goes to, if you look at Roseboro, if you look at Marble Murillette and that line of cases, you always, you always have some scientific information. They had, I mean, they studied Murillettes to death. They studied spotted owls to death. On bull trout in this creek, they had not even visited it before opining that take had occurred. And subsequent to that, they made no effort to go out and look at this and to determine, for instance, the temperature. It is not a complex matter to stick a thermometer in a stream and see, in a creek, and see if the temperature is lethal. And if the temperature was not in excess of generally the 9 to 12 centigrade, that is a determining factor for bull trout, there is no actual injury and there is no take under Section 9 for a defendant in my client's position. This case should not have been brought against my client. It was a matter for the plaintiffs and the Forest Service. And my client got caught up in the dispute between the two over the section consultation. There was no showing of a Section 9 take. There was no showing of an imminent likelihood of harm because they had no data on which to rely. The only information they had came out of the Forest Service's biological assessment, which is prepared pursuant to Section 7 obligations. And Sweet Home clearly distinguishes between Section 7 obligations for the agencies and a Section 9 takings claim against private parties. Counsel, let me go back to your suggestion that why should they be paid twice? Once for suing under Section 7, the Forest Service and one, and then to be paid again, weren't they seeking two different things? One, the suit against the Forest Service to compel the Forest Service to consult with USFWS under Section 7 on the diversion impact on the bull trout. But the suit against your client sought, as I understand it, and correct me if I'm wrong, to enjoin them from diverting water until the service could finish this consultation. Aren't these two separate and distinct suits? You're correct, Your Honor. There's two separate sets of claims. And they were paid for the claims, the Section 7 claims against the Forest Service, and all the rest of the fees that we are talking about here today came out of the claim, the Section 9 taking claim against my client. And again, if I can leave you with one point, the Section 9 takings claim against my client is a very specific type of claim. And it's our position that any injunction that issued based on the evidence in this case was wrongful, and a wrongfully issued injunction is not grounds for awarding attorney fees against a defendant in my client's position. Thank you. Okay. Thank you, Mr. Smith. Mr. Lucas. Thank you, Your Honor. May it please the Court. I'm Laird Lucas for the Appalese-Idaho Watersheds Project and Committee for the High Desert. Judges, if I could address the procedural status of the case in a bit more detail, because I think it's important you understand what happened. In spring of 2001, we filed for an injunction and put in a lot of work at that time, expert declarations, briefings, laid out our case. Mr. Smith at that time stipulated, because his client said they would not divert, to not divert. We filed a stipulation with the court giving us our injunctive relief. Two months later, he filed a notice with the court saying they intended to abrogate that. We went back in and got another injunction, a TRO from the district court, which was then resolved through another stipulation. So most of the work in this case was right up front and resulted in injunctive relief from the court that was never appealed and never went to the Ninth Circuit. A year later, we went through summary judgment where I relied on all of the stuff we had put in during the injunction proceedings. The further litigation we had to do was because he was challenging our expert qualifications under Dobear. We had to go through a whole Dobear set of litigation. This is at the summary judgment stage. Judge Windmill looked at the competing sets of declarations and affidavits. His decision from 2002 is in the record and it's very careful. He says, they say this, plaintiffs say that, they did not respond to certain points. And that's what went to the Ninth Circuit. You see, the problem I've got with that, Mr. Lucas, is you may be absolutely right on all this, but Judge Windmill's attorney's fee order doesn't say any of that. The only thing he does say is flatly wrong because the injunction had to have been overruled by the Ninth Circuit. So you're going back to square one. And I can't tell how much of his decision is influenced by the preliminary injunction, the permanent injunction that he based his ruling on. So my question to you is, even if you're correct at the end of the day and you most, if not all, of the fee application is correct, why shouldn't it go back for, in effect, a Kerr factor analysis? Two reasons, Your Honor. And a statement, and under an instruction that you can't rely entirely on a vacated injunction. Two reasons, Your Honor. I don't think he was flatly wrong in his fee decision. He says that the court later entered a permanent injunction that remained in place throughout this case and was not removed by the Ninth Circuit's decision. He's not saying the Ninth Circuit didn't vacate the injunction that was in place. I think the underlying issue was it was not appealed during the, we had two years we were on appeal, the Ninth Circuit. They made no effort to stay the injunction. The injunction remained in place for several years. We're looking at the real world impact of what happened on the street. So are you suggesting that his reference to the permanent injunction is just a typo and what he really meant to say was preliminary? I would say that when you look at the bulk of his analysis, that is a minor mischaracterization that may technically not be right, but it captures what happened on the ground, which is we had a series of injunction orders, and it was not the injunction that went to the Ninth Circuit. It was summary judgment. Was there a genuine dispute of material fact? The Ninth Circuit said, yes, there's a genuine dispute of material fact. Go back for trial. They said nothing about an improper injunction. In fact, the Ninth Circuit said it applied the same standard the judge did. If the evidence demonstrates a reasonably certain imminent threat, then there should be an injunction, is what the Ninth Circuit said. A genuine dispute of material fact over which issue? Over the question of the impacts of the diversion. They had found- The taking, the issue of taking, right? The issue of taking, that's correct. Or threatened taking. Or threatened taking, that was the factual issue. And without a taking or a threatened taking, the Joneses didn't have to do anything, did they? But the Ninth Circuit didn't say there was no threat of taking. The Ninth Circuit said, for summary judgment purposes, we see a dispute of fact that requires trial. It says there's not enough evidence to establish a taking or a threat of taking. I'm sorry, respectfully, Your Honor, that is not what the order says. It says only, given this treatment of the evidence, they're talking about expert versus lay evidence, we must conclude that the lay testimony and Larkin affidavit are relevant and create genuine issues of material fact. We therefore reverse the judgment of the district court. It didn't say it was inadequate evidence. There's nothing in there saying it was not adequate. Judge Windmill found way back in the first injunction that we had shown a likelihood of a take, and we base that on experts from the government, data from the government. Mr. Smith wants to portray it as not showing a take, but we amply met the standards for take, and had we gone to trial, we would have proven a take. Two weeks before trial, he finally stipulated to what we had asked for for five years and avoided a trial. He's now trying to challenge all of the substance of stuff that happened through the attorney fee appeal, which is not appropriate. And the other answer, Judge Reimer, is Mr. Smith did not challenge the $35,000, how that was come up with, either before the district court or on appeal. He challenged the $12,000 in his brief to you. He didn't say there was anything wrong within the $35,000. He said, shouldn't be any $35,000, but he didn't try to parse it out of what happened in 2000 for that first injunction or 2002 for Doe-Bear or whatever. He's not saying there was some error in there, so he's not raised that issue on appeal. I don't think this court has the jurisdiction because it hasn't been properly raised. Well, that's why I asked the question I did to begin with, because I can't tell. I mean, because it strikes me that if there were, if to the extent there's an error in relying on our injunction, then it would necessarily affect some part of that $35,000. But if it's not being contested, then I guess it'd just say, well, okay, so what? And that's my argument. He has not contested. You can read his brief here. He has nothing about why $35,000 should have been $12,000 or $14,000 or $21,000 or whatever. But really, we prevailed at various stages of litigation before summary judgment in the first round of injunction proceedings. That was most of the work in the case, other than the Doe-Bear challenge, which we also prevailed on. So if one were to look at those, you'd say the bulk of our work went to our success in achieving our goals under the catalyst theory. It'd be very hard to carve anything out. I think that's what Judge Windmill found. And I think this court owes deference to that under the abuse of discretion standard. It's a factual finding, clearly erroneous. Mr. Smith has not shown clear error there. Mr. Lucas, I quote under the Ninth Circuit stated, quote, under the relevant substantive law, the Joneses should be enjoined to use a fish screen and a head gate if there is a reasonably certain imminent threat. And then they said, there's a genuine issue of material fact on this, and it should go back for decision. And then they vacated the injunction, didn't they? They vacated the judgment of the court, which entered summary judgment and a permanent injunction. I'm not disputing that the Ninth Circuit reversing on summary judgment also reversed the injunction. But I think, Judge, to the extent you're trying to say the Ninth Circuit somehow ruled on the quantum of evidence we had and said it wasn't enough, that's not right. They were just saying there's disputed facts. I'm not trying to say anything. I was just reading what the Ninth Circuit said. I'm trying to understand what happened. And I think when you come back to the case that we all agree is the controlling case, the Association of California Water Agencies versus Evans, I mean, this is a case that was dismissed as moot. Mr. Smith filed his motion to dismiss. We included it in our supplemental excerpts of record to show you what his arguments were. It was mootness, no Article III jurisdiction. We agreed with that because they had taken the position we had been wanting them to take all along. All of us agreed the case was moot. The judge dismissed it as moot. That's where Evans comes in. In the ESA, Endangered Species Act context, you have a moot case, you go through the two-pronged test that Judge Reimer was articulating. I know. See, okay, are you arguing that the error of C, normally if it, I mean, I certainly believe in deferring a district court's discretion on something like this. I mean, he was on the scene. But when he says that you achieved your goal early in the case on a TRO that eventually became a permanent injunction blocking any diversions was obtained. But that was reversed. And he doesn't say, even though it was reversed, I find that all of the work that was done was justified. Excuse me. He does say, up until September of 05, the Ninth Circuit decision was in February or April of 05. So, in other words, we just disregard the reversal altogether. No, I'm not saying that, Your Honor. You're saying it's harmless. In September of 05, after the Ninth Circuit's decision, they filed an expert declaration contesting the need for a fish screen, saying our experts were wrong, setting us all up for trial. That continued the dispute past the Ninth Circuit's ruling. After the Ninth Circuit ruled, I filed another motion for injunction to make sure they didn't divert. Again, they filed a stipulation or a declaration saying, well, we won't divert this summer. So I withdrew the motion. Through this litigation, we made sure they did not divert. This whole case has been about, are they going to operate this diversion and harm bull trout until the Forest Service completes its consultation process? Mr. Smith says the case should have ended when we got the Forest Service to start consultation, but it took them five years or four years. During that time, were they going to harm bull trout by operating the diversion? They would have. They claimed every right to, except for our litigation. We had to go through this dance of filing motions and then getting declarations saying they wouldn't do it and withdrawing motions. But that went all the way up to the eve of trial, and I think that's what Judge Windmill was capturing in his statement there. It is a bit of a shorthand, but I really don't think it's clearly erroneous when you look at the whole scope of the litigation. In any event, Your Honors, I think the association of California Water Agencies versus Evans is right on point. Controlling law, Judge Windmill followed it. There's no error of law here. He made factual determinations on both prongs. This Court can only reverse if they're clearly erroneous, which means no evidence in the record to support him. There's abundant evidence in the record, including what he said in his fees decision, so I ask you to affirm. Okay. Thank you very much. Mr. Smith, you have enough time to say something, if you want to say something. Four seconds. Of course, the injunction was critical. If there was a wrongfully issued injunction, it did not justify the award of attorney's appeal. Okay. Counsel, we appreciate your argument, both of you, and the matter just argued will be submitted and the Court will stand adjourned for this session. All rise.   The majority is having a chance of dying.
judges: Nelson, Rymer, Beam